DAMIAN WILLIAMS
United States Attorney
Southern District of New York
By:    JEFFREY K. POWELL
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2706
Email: jeffrey.powell@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>     -against-<br><br>ESTATE OF MORRIS BERKOWITZ, TZODIK WEINBERG a/k/a JUSTIN WEINBERG, and MAIER ARM,<br><br>                              Defendants. | 23 Civ. 3803<br><br>COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

The United States of America, by its attorney, Damian Williams, United States Attorney for

the Southern District of New York, files this civil fraud action seeking damages and penalties against

the Estate of Morris Berkowitz (the "Estate"), Tzodik Weinberg a/k/a Justin Weinberg ("Weinberg"),

and Maier Arm ("Arm," and together with the Estate and Weinberg, "Defendants") under the federal

False Claims Act, and in the alternative under the common law, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Skilled nursing facilities typically receive higher daily payments for residents who are

enrolled in what is often referred to as "Original Medicare," which includes Medicare Parts A and B,

than they receive for residents who are enrolled in private Medicare Advantage Plans ("MA Plans")

under Medicare Part C.  It is well known within the skilled nursing facility industry that it is usually

more profitable to admit residents with Original Medicare.  Defendants engaged in two fraudulent

and illegal schemes to increase the number of Original Medicare residents at the Morris Park Nursing

Home ("Morris Park"), a skilled nursing facility located in the Bronx, New York.  During the

relevant period, Morris Park was owned and operated by Morris Berkowitz, who died in April 2020.

Defendant Weinberg served as the facility's Administrator.

2.      *First*, from January 1, 2018, through December 31, 2019, Morris Park, at the direction

of Weinberg, disenrolled residents from their self-selected MA Plans and enrolled them in Original

Medicare without obtaining the consent of the residents or their authorized representatives.

3.      Weinberg pressured Morris Park staff to disenroll residents from their MA Plans.  In

most cases, Defendants switched residents' insurance coverage without getting the residents or their

family members to sign a consent form or any other document evidencing the resident's consent to

the insurance change, which had the potential to impact the resident's out-of-pocket payments, the

scope of the services and care covered, and the resident's drug coverage plan.  In several instances,

Defendants disenrolled residents after they or their family members advised Morris Park staff that

they did not want to change their insurance coverage.  In other instances, Morris Park staff offered to

reduce or waive the co-payments that would be owed by residents under Original Medicare in order

to induce them to disenroll from their MA Plan.

4.      In the summer of 2018, on Weinberg's recommendation, Morris Park retained

Weinberg's friend, Defendant Arm, to assist with the improper disenrollments.  Morris Park paid

Arm a $1000 fee for each resident whom Arm helped to switch to Original Medicare.  Arm agreed to

split this $1000 fee with Weinberg, so Weinberg would pocket $500 for each resident who was

disenrolled.

5.      Starting in early 2019, Morris Park also paid Weinberg a cash bonus if the average number of Original Medicare residents at the facility was maintained at or above a certain level each month.  Other Morris Park staff involved in admissions and marketing also received cash bonuses tied to the admission of Original Medicare residents.

6.      *Second*, from January 1, 2017, through December 31, 2019, Morris Park offered and paid remuneration in the form of cash payments, meals, and sports tickets to a Jacobi Medical Center ("Jacobi") discharge planning supervisor (the "Jacobi Manager") to induce her to refer Original Medicare beneficiaries for admission to Morris Park.  Jacobi is a hospital located near Morris Park. For much of this period, Morris Park paid the Jacobi Manager $150 for each referred patient who was admitted to the facility.

7.      Weinberg was responsible for delivering the cash payments personally to the Jacobi Manager, often arranging to meet her at a CVS parking lot close to Morris Park.  He regularly reached out to the Jacobi Manager to request patient referrals when the facility had empty beds.  They exchanged lists reflecting the Medicare patients who were discharged from Jacobi to Morris Park, which Morris Park used to calculate the cash payments to be made to the Jacobi Manager.

8.      From 2017 through 2019, Morris Park paid the Jacobi Manager a total of approximately $5,000 to $10,000 for dozens of Original Medicare Jacobi patients who were referred and admitted to Morris Park.

9.      By virtue of the foregoing conduct, Defendants violated the False Claims Act ("FCA"), as well as the federal Anti-Kickback Statute ("AKS"), and submitted or caused to be submitted false claims for payment to Medicare for care and services provided to Morris Park residents.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the claims brought under the FCA

pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the common law claims

pursuant to 28 U.S.C. § 1345.

11.     The Court may exercise personal jurisdiction over Defendants pursuant to

31 U.S.C. § 3732(a), which provides for nationwide service of process.

12.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.

§§ 1391(b)-(c) because at least one of the Defendants can be found in, resides in, or transacts

business in this District and a substantial part of the acts complained of occurred in this District.

13.     No official of the United States charged with the responsibility to act in the

circumstances knew or should have known of the facts material to the FCA claims asserted in this

Complaint prior to July 2020.

## PARTIES

14.     Plaintiff is the United States of America. Through the Department of Health and

Human Services ("HHS"), and more specifically through the Centers for Medicare and Medicaid

Services ("CMS"), a component agency within HHS, the Government administers the Medicare

Program.

15.     During the relevant period, Morris Berkowitz owned and operated Morris Park as a

sole proprietorship.  Morris Park is a 191-bed skilled nursing facility located at 1235 Pelham

Parkway North, Bronx, NY 10469.  Morris Berkowitz died on April 17, 2020, and his wife, Doris

Berkowitz, is the designated Executrix of his estate.  The probate petition was granted by the Kings

County Surrogate's Court.  Shortly before the death of Morris Berkowitz, a limited liability company

owned and controlled by Morris Berkowitz's son assumed ownership of Morris Park.

16.     Defendant Tzodik Weinberg a/k/a Justin Weinberg was employed as the Administrator of Morris Park from August 2016 through December 2019.  He also served as the Compliance Officer for the facility.  Weinberg resides in Clifton, New Jersey.

17.     Defendant Maier Arm was retained as an independent contractor by Morris Park from August 2018 through early 2020.  Arm was involved in disenrolling residents from their MA Plans and enrolling them in Original Medicare.  Arm resides in Suffern, New York.

## BACKGROUND

### I.     Original Medicare and the Medicare Advantage Program

18.     Medicare is a federally-operated health insurance program administered by CMS, benefiting individuals 65 and older and individuals with disabilities.  *See* 42 U.S.C. § 1395c *et seq*. Medicare covers up to 100 days of care in a skilled nursing facility for each benefit period.  The first 20 days are covered fully, and beneficiaries are required to make a daily co-payment starting on day 21 at the skilled nursing facility.

19.     There are four parts of the Medicare Program: Part A primarily covers inpatient and institutional care; Part B primarily covers outpatient care; Part C is the Medicare Advantage Program; and Part D is prescription drug coverage.

20.     A Medicare beneficiary may elect to enroll in what is often referred to as "Original Medicare" or "Straight Medicare," which includes Medicare Parts A and B.

21.     Alternatively, an individual may elect to opt out of Original Medicare and instead enroll in an MA Plan pursuant to Medicare Part C.  These MA Plans are operated and managed by Medicare Advantage Organizations, which are private insurers that contract with CMS.  *See* 42 C.F.R. §§ 422.2, 422.503(b).  MA Plans are required to provide Medicare beneficiaries with all the

services that they are entitled to receive under Original Medicare, at a minimum, subject to limited exceptions.

22.     CMS advises qualifying individuals to consider various factors in deciding between Original Medicare and an MA Plan for their health coverage. *See* Compare Original Medicare Medicare Advantage, https://www.medicare.gov/basics/get-started-with-medicare/get-more-coverage/your-coverage-options/compare-Original-medicare-medicare-advantage (last visited April 11, 2023).

23.     For example, certain MA Plans charge lower out-of-pocket costs to beneficiaries than Original Medicare, including with respect to deductibles, co-payments, and co-insurance. *See id.* Further, unlike Original Medicare, MA Plans cap out-of-pocket expenses that may be incurred by beneficiaries in a given year. *See id.* MA Plans may also offer additional benefits to beneficiaries not provided by Original Medicare, such as coverage for vision, hearing, and dental services. *See id.*

24.     Medicare beneficiaries can also obtain drug coverage in different ways, depending on whether they are enrolled in Original Medicare or an MA Plan. Beneficiaries enrolled in Original Medicare may participate in an individual prescription drug plan offered by an insurer approved by CMS (a "Stand Alone Drug Plan"). Part C Beneficiaries may opt to enroll in an MA Plan that includes a prescription drug plan (a "Medicare Advantage Drug Plan").

25.     Original Medicare and MA Plans differ in how providers seek and receive reimbursement for claims. Under Original Medicare, CMS reimburses healthcare providers, such as skilled nursing facilities, on a fee-for-service basis under which providers submit claims to CMS for healthcare services and CMS then pays the provider directly based on payment rates determined by the Government. When a healthcare provider furnishes medical services to a Medicare beneficiary enrolled in an MA Plan, however, the provider submits claims for payment to the Medicare

Advantage Organization that operates the MA Plan.  CMS pays the Medicare Advantage

Organization a fixed, capitated amount (per beneficiary enrollee in each MA Plan) each month for

providing coverage for the Medicare beneficiaries enrolled in the plan.

26.     It is well known within the skilled nursing facility industry that it is typically more

profitable to admit residents who are enrolled in Original Medicare than residents who are enrolled in

MA Plans.

27.     Payments from Original Medicare to institutional providers, such as skilled nursing

facilities, are conditioned on their enrollment in the Medicare program.  Institutional providers apply

for enrollment by completing a Medicare enrollment application, known as a Form CMS-855A.  *See*

Medicare Enrollment Application (Institutional Providers), https://www.cms.gov/medicare/cms-

forms/cms-forms/downloads/cms855a.pdf (last visited April 11, 2023).  To complete such

enrollment, institutional providers must: (1) certify that they will abide by applicable "Medicare laws,

regulations and program instructions"; and (2) attest that the institutional provider understands that

"payment of a claim by Medicare is conditioned upon the claim and the underlying transaction

complying with such laws, regulations, and program instructions (including, but not limited to the

Federal anti-kickback statute and the Stark Law)...."  *Id.*

28.     Skilled nursing facilities submit claims to Original Medicare on Form CMS-1450.

Form CMS-1450 requires, among other things, the provider who signs the form to represent that "the

submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

## II.   **Changes to Medicare Coverage**

29.     Any changes to a Medicare beneficiary's healthcare coverage generally must be initiated by the beneficiary or their authorized legal representative.  A skilled nursing facility is not permitted to disenroll one of its residents from an MA Plan without an informed and authorized election by the resident or the resident's legal representative.

30.     Specifically, it is the "[MA Plan] eligible institutionalized individual" who "may at any time elect an MA plan or change his or her election from an MA plan to Original Medicare, to a different MA plan, or from Original Medicare to an MA plan." 42 C.F.R. § 422.62(a)(4).  In cases where a resident is "adjudged incompetent under the laws of a State by a court of competent jurisdiction, the rights of the resident devolve to and are exercised by the resident representative appointed under State law to act on the resident's behalf." 42 C.F.R. § 483.10(b)(7).

31.     A skilled nursing facility may "[n]ot request or require residents or potential residents to waive their rights . . . to Medicare." 42 C.F.R. § 483.15(a).  Instead, skilled nursing facility residents possess the rights to: (i) self-determination "without interference"; (ii) "be informed of, and participate in, his or her treatment," including regarding any proposed "changes to the plan of care" by a skilled nursing facility; and (iii) the "manage his or her financial affairs." 42 C.F.R. § 483.10.

32.     In addition, long-term care facility residents, like all Medicare beneficiaries, have a right to select their Part D drug plan, and the enrollment in the drug plan must be completed by the individual. 42 C.F.R. §§ 423.32(a) & (b).

33.     Consistent with these regulations, CMS has issued guidance relating to Medicare coverage elections in its Medicare Managed Care Manual.  The Manual instructs that, except in scenarios where state law has permitted an election by an authorized representative on behalf of a beneficiary, the beneficiary him or herself is the "only individual who may execute a valid request for

enrollment in or disenrollment from an MA Plan." *See Medicare Managed Care* Manual, Ch. 2, § 40.2.1

34.    In May 2015, CMS issued a memorandum setting forth long-term care facilities' responsibilities to ensure that changes to beneficiaries' healthcare coverage comply with applicable regulations. *See Memo to Long Term Care Facilities on Disenrollment Issues* (May 26, 2015) (the "CMS Disenrollment Memorandum").[1] CMS reported that it "continue[d] to see an unacceptable practice of [long-term care] facilities disenrolling beneficiaries from Medicare advantage prescription drug plans [ ] and enrolling them into stand-alone drug plans [ ] **without the beneficiary's or the representative's knowledge and/or complete understanding.**" *Id.* at 1 (emphasis in original). CMS noted that this resulted in the beneficiary being enrolled back in Original Medicare and observed that this practice was "noncompliant with regulatory requirements." *Id.*

35.    CMS further emphasized that "[a]ny change in a beneficiary's health care coverage must be initiated by the beneficiary or his/her representative." *Id.*  CMS also stated that, in the event that the long-term facility assisted with a Medicare enrollment/disenrollment, the facility should explain the impact of the change in coverage to the beneficiary orally and in writing. *Id.* at 1.  For example, the CMS Disenrollment Memorandum instructed that the skilled nursing facility should explain to the resident, among other things, any impact regarding deductibles, co-pays, and loss of supplemental coverage that would result from the insurance coverage change, and that the beneficiary would no longer be a member of their Medicare Advantage Drug Plan. *Id.*

---

[1] In October 2021, CMS issued an updated memorandum that superseded the CMS Disenrollment Memorandum and contained similar guidance. *See Memo to Long Term Care Facilities on Medicare Health Plan Enrollment*, https://www.cms.gov/files/document/ltcfdisenrollmentmemo.pdf  (last visited April 11, 2023).

36.     CMS also advised that skilled nursing facilities should develop "written policies and procedures regarding the process of assisting beneficiaries with changing their health care coverage" that, at minimum, identified the circumstances when a facility could assist a resident with a plan change, and required signed attestations regarding the information provided to residents ahead of any insurance plan change. *Id.* at 2.

37.     CMS noted that it would report improper election decisions by skilled nursing facilities on residents' behalf for investigation as "fraud and abuse incidents." *Id.*  Further, CMS explained that if a long-term care facility could not provide "documentation of a beneficiary's request to change enrollment," CMS would "consider the enrollment not to be legally valid, cancel the enrollment action and, if necessary and appropriate, reinstate the beneficiary's [Medicare Advantage or Medicare Advantage Drug Plan] [ ] coverage as if never disenrolled." *Id.*

### III.     The False Claims Act

38.     The FCA establishes liability to the United States for any person who "knowingly presents, or causes to be presented, [to an officer or employee of the United States Government] . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).

39.     Under the FCA, the term "knowingly" is defined to include actual knowledge, reckless disregard, and deliberate indifference. *Id.* § 3729(b)(1).  No proof of specific intent to defraud the Government is required. *Id.*

40.     The FCA imposes liability of treble damages plus a civil penalty for each false claim. *Id.* § 3729(a)(1).

IV.     **The Anti-Kickback Statute**

41.     The AKS prohibits any person or entity from knowingly and willfully offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to: "(A) refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

42.     Pursuant to the AKS, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

## FACTUAL ALLEGATIONS

43.     During the relevant period, it was generally more lucrative for Morris Park to admit residents enrolled in Original Medicare than residents enrolled in MA Plans. This was due in part to the higher daily reimbursement rate the facility received under Original Medicare and the fact that Original Medicare beneficiaries were often approved for longer stays in the facility.

44.     As the Administrator of Morris Park, Weinberg took numerous steps to boost the number of Original Medicare residents. He closely tracked the percentage of residents at the facility at any given time who had Original Medicare, and encouraged Morris Park marketing and admissions staff to increase these numbers.

45.     Beginning in early 2019, Morris Park paid Weinberg a cash bonus if the average number of Original Medicare residents at the facility was maintained at or above a certain level each month. Weinberg received multiple monthly bonuses for reaching these targets. Other Morris Park

staff involved in admissions and marketing also received cash bonuses that were tied to the admission of new residents with Original Medicare.

46.     Morris Park staff, including Weinberg, engaged in two fraudulent and illegal schemes to increase the number of Original Medicare residents at the facility: (i) they disenrolled residents from their self-selected MA Plans and enrolled them in Original Medicare without obtaining the consent of the residents or their authorized representatives; and (ii) they offered and paid remuneration in the form of cash payments, meals, and sports tickets to the Jacobi Manager to induce her to refer Original Medicare beneficiaries for admission to Morris Park upon their discharge from Jacobi.

**I.      The Fraudulent and Illegal Scheme to Switch Residents' Medicare Coverage**

47.     Shortly after Weinberg became Administrator in late 2016, he directed Morris Park staff to try to persuade residents to disenroll from their MA Plans and to enroll in Original Medicare instead, in order to increase the facility's revenues.

48.     Weinberg identified residents who were candidates for disenrollment and then pressured staff to take steps to switch their insurance coverage. For example, after being notified in July 2018 of a new admission who was enrolled in a MA Plan, Weinberg forwarded the resident's information to a staff member with a one-word email message stating: "Disenroll!!!!!!"

49.     Weinberg repeatedly reached out to staff for updates on their efforts to get residents to disenroll from their MA Plans. He soon became frustrated with the lack of results, however, and believed that the staff member primarily responsible for working on disenrollments was not doing enough to switch residents to Original Medicare.

50.     In the summer of 2018, Weinberg contacted his friend, Arm, who worked full-time at another skilled nursing facility in the Bronx. Weinberg and Arm lived in the same neighborhood in

the Bronx and had previously discussed entering into various business ventures together in the healthcare area. Weinberg asked Arm to assist with the disenrollment process at Morris Park. Arm reached an agreement under which Morris Park would pay him a $1000 fee for each Morris Park resident Arm helped to disenroll from an MA Plan and enroll in Original Medicare. Weinberg and Arm further agreed to split this $1000 payment, so that Weinberg would pocket $500 for each disenrolled resident.

51.     Shortly after reaching this agreement, Weinberg arranged a meeting between Arm and the facility's Director of Operations at that time. Weinberg recommended that Morris Park retain Arm to help switch residents from MA Plans to Original Medicare. Weinberg and Arm did not mention at that meeting, or at any time while the arrangement was in place, that Arm had agreed to split the $1000 payment for each disenrollment with Weinberg.

52.     From August 2018 through December 2019, Morris Park paid Arm $1000 for each resident who was disenrolled from their MA Plan and enrolled in Original Medicare. Morris Park typically paid Arm on a monthly basis. The initial monthly payments were made to Revenue Enhancer, a company created and owned by Arm. In November 2018, Arm and Weinberg formed a new company together called We R Legends Therapy LLC, with each having a 50% interest in the company. Starting in December 2018, Morris Park directed the monthly disenrollment payments to We R Legends Therapy's bank account. Weinberg had full access to and withdrew funds from this account.

53.     Once Arm was retained, the pace of disenrollments dramatically increased. Weinberg and Arm identified new admissions who were good candidates to be switched to Original Medicare. Then, at the direction of Weinberg and Arm, Morris Park staff approached residents, often at their bedside, to try to persuade them to switch their insurance coverage. Staff also urged the residents'

family members to make the change.  Arm and Weinberg coached Morris Park staff on how to pitch

Original Medicare to residents and their family members.

54.     Weinberg continued to exert significant pressure on Morris Park staff to disenroll

residents from their MA Plans.  In one instance in July 2019, Weinberg even directed a staff member

to disenroll a resident who clearly lacked the capacity to consent to a change in her insurance

coverage.  The staff member asked Weinberg "[h]ow do we do a dis enrollment [sic]" when the

resident "is not alert" and had no family.  Weinberg responded: "We just do it."  Arm was included

in this exchange.  Following Weinberg's direction, Morris Park disenrolled this resident from her MA

Plan and enrolled her in Original Medicare.

55.     In another example, on September 19, 2019, Weinberg directed the same staff member

to disenroll a resident from his MA Plan due to the fact that the plan had a particularly low daily

payment rate.  Weinberg told the staff member: "[H]e MUST be disenrolled[.]  We're losing our

pants on him."  Arm was included in this exchange as well.

56.     When staff failed to get residents to agree to disenrollment, Arm and Weinberg would

personally approach the residents or their family members to attempt to convince them to change

their insurance coverage.

57.     When talking to residents and their families, Morris Park staff typically did not fully

explain how the change to Original Medicare would impact the resident's coverage, including

potential changes to the resident's co-payments and deductibles; the potential loss of supplemental

coverage available under the resident's MA Plan; any resulting change in the resident's drug plan; or

limitations on when the resident could re-enroll in the plan after leaving Morris Park.

58.     Weinberg and Arm also revamped the "disenrollment form" that residents were

supposed to sign when switching from an MA Plan to Original Medicare.  Weinberg and Arm created

a new, abbreviated form that omitted the description of how disenrollment could impact coverage and other disclosures that were included in the prior version. Weinberg and Arm instructed staff to use this much shorter, less informative version of the disenrollment form.

59.     In most cases, however, Defendants disenrolled residents from their MA Plans without getting the resident or their family members to sign the disenrollment form or any other document evidencing consent to the insurance change. Neither Weinberg (who also served as the facility's Compliance Officer), Arm, nor anyone else at Morris Park made any effort to confirm that staff had actually obtained signed disenrollment forms before processing the disenrollment and enrolling residents in Original Medicare.

60.     Furthermore, in some instances, Morris Park staff offered inducements to residents or their family members to try to persuade them to agree to the disenrollment. For example, at the direction of Weinberg, staff sometimes offered to reduce or waive the co-payments that residents would be required to pay starting on the 21st day of their stay in the facility if they agreed to switch to Original Medicare. Weinberg was ultimately responsible for approving any such co-payment reduction or waiver.

61.     Several days each week, Arm went to Morris Park to assist with disenrollments. He conferred with Weinberg, provided direction to Morris Park staff, and on occasion talked directly with residents and family members about switching to Original Medicare.

62.     Arm was also responsible for processing the disenrollments and effectuating the insurance coverage change. He did this by logging on to the Medicare.gov website using the resident's personal identifying information. After logging on, Arm would enroll the resident in a Part D Stand Alone Drug Plan, which resulted in the resident automatically being disenrolled from their MA Plan and being enrolled in Original Medicare. Arm independently decided which specific

Part D Prescription Drug Plan to enroll the resident in, without any input from the resident or their family. When submitting the information online to effectuate the disenrollment, Arm misrepresented on the Medicare online platform that he was either: (i) the Medicare beneficiary joining the Part D Prescription Drug Plan (or a person helping the Medicare beneficiary complete the online enrollment form); or (ii) a person authorized to act on behalf of the Medicare beneficiary under state law.

63.   Morris Park did not offer residents assistance with re-enrolling in their MA Plans upon their discharge from the facility.

64.   As a result of the above-referenced conduct, Morris Park submitted claims seeking reimbursement from Original Medicare for skilled nursing care provided to residents who had not properly consented to their enrollment in Original Medicare, or who had been offered remuneration (such as a waiver or reduction in their co-payments) to agree to switch their insurance coverage. In several instances, Defendants disenrolled residents from their MA Plans after they or their family members had expressly notified Morris Park staff that they did not want to be disenrolled.

65.   Family members of certain residents complained after learning that their loved ones' insurance coverage had been changed. For example, in May 2019, Morris Park staff advised Arm and Weinberg that a resident's son was "very upset" and "wants to know who disenrolled his mother."

66.   In September 2019, an outside company that Morris Park had retained to assist with compliance-related tasks emailed Weinberg a PowerPoint training presentation on the requirements of the 2015 CMS Disenrollment Memorandum referenced above, and the steps that long-term care facilities should take to comply with applicable regulations when changing a resident's healthcare coverage from Medicare Part C to Original Medicare. The training noted, among other things, that a long-term care facility "may not play a role in changes to a resident's health insurance coverage

without the resident's or designated representative's full knowledge and consent" and that "[u]nder

no circumstances should the [facility] require, request, coach, or steer any resident to select or change

a plan for any reason." Even after receiving this PowerPoint training presentation, Weinberg took no

steps to address the facility's ongoing non-compliance with the guidance in the CMS Disenrollment

Memorandum and applicable regulations, or the manner in which Defendants disenrolled residents

from their self-selected MA Plans.

67.    During the relevant period, using Form CMS-1450, Morris Park submitted claims to

Medicare for skilled nursing care provided to these residents whose Medicare coverage had been

improperly changed. When submitting these claims, Morris Park did not disclose that the resident

had been enrolled in Original Medicare without their consent, that Arm had made misrepresentations

to effectuate the disenrollment on the Medicare.gov website, or that Arm split the $1000 fee he

received for each disenrolled resident with Weinberg. In these submissions, Morris Park falsely

certified that it had not knowingly or recklessly disregarded, misrepresented, or concealed facts that

were material to the submitted claim. Further, by failing to comply with Medicare regulations and

program instructions, Morris Park rendered false the prior certifications it had made in its Medicare

enrollment application regarding its compliance with such requirements.

68.    For example, in early 2019, Morris Park disenrolled Residents 1, 2, and 3[2] from their

self-selected MA Plans even after the residents and/or their family members had indicated they did

not want to switch their Medicare coverage. Morris Park subsequently submitted claims to Medicare

seeking payment for the skilled nursing care provided to each of these individuals. Specifically,

Morris Park sought payment for skilled nursing care provided to Residents 1, 2, and 3 as follows:

---

[2] In order to protect the confidentiality of residents' personal health information, the Complaint does not include the names of the specific Morris Park residents. The Government will disclose the names of these residents to Defendants upon request.

- Resident 1 was disenrolled from their MA Plan on or about February 1, 2019. Following the disenrollment, Morris Park submitted claims to Original Medicare for skilled nursing care provided to Resident 1 while they were in the facility.  Morris Park received approximately $38,966 in payments from Medicare for skilled nursing care during this period, which is substantially more than it would have received had Resident 1 remained enrolled in their MA Plan.

- Resident 2 was disenrolled from their MA Plan on or about February 1, 2019. Following the disenrollment, Morris Park submitted claims to Original Medicare for skilled nursing care provided to Resident 2 while they were in the facility.  Morris Park received approximately $14,226 in payments from Medicare for skilled nursing care during this period, which is substantially more than it would have received had Resident 2 remained enrolled in their MA Plan.

- Resident 3 was disenrolled from their MA Plan on or about March 1, 2019.  Following the disenrollment, Morris Park submitted claims to Original Medicare for skilled nursing care provided to Resident 3 while they were in the facility.  Morris Park received approximately $63,027 in payments from Medicare for skilled nursing care during this period, which is substantially more than it would have received had Resident 3 remained enrolled in their MA Plan.

69.     As a result of the fraudulent changes to Morris Park residents' Medicare coverage during the relevant period, the Government paid hundreds of thousands of dollars more for the skilled nursing care provided to these residents than it would have paid if the residents had remained enrolled in their MA Plans.

**II.     The Payment of Cash Kickbacks for Patient Referrals**

70.     In a separate scheme, Morris Park offered and paid the Jacobi Manager cash to induce her to refer Original Medicare beneficiaries to Morris Park upon their discharge from the hospital.

71.     Jacobi is a municipal hospital operated by NYC Health + Hospitals and is located in close proximity to Morris Park.  Jacobi is one of the top patient referral sources for Morris Park.

72.     Morris Park regularly solicited patient referrals from Jacobi staff, including the Jacobi Manager and two other Jacobi staff members who reported to her.  These Jacobi employees were responsible for recommending placements to Jacobi patients (and their families) who required skilled nursing care and rehabilitation services after their hospital stay.

18

73.     Shortly after Weinberg joined Morris Park, the staff member who served as the facility's marketer at the time introduced him to the Jacobi Manager.  The marketer and Weinberg asked the Jacobi Manager to refer as many Original Medicare patients to Morris Park as she could.

74.     From 2017 through 2019, Morris Park offered to make, and in fact made, cash payments to the Jacobi Manager for each Original Medicare patient referral that resulted in an admission to the facility.  For much of this period, Morris Park paid the Jacobi Manager the sum of $150 for each referral.

75.     Weinberg was responsible for delivering the cash payments personally to the Jacobi Manager.  They texted to arrange a time and place to meet in person, often meeting at a CVS parking lot close to Morris Park.

76.     On a periodic basis, the Jacobi Manager and Weinberg exchanged lists reflecting the Medicare patients who were discharged from Jacobi to Morris Park.  Morris Park used these lists to calculate the cash payments to be made to the Jacobi Manager.

77.     In total, from 2017 through 2019, Morris Park paid the Jacobi Manager approximately $5,000 to $10,000 for referring dozens of Original Medicare patients to Morris Park.

78.     Morris Park also frequently provided the Jacobi Manager and her staff with meals. For example, on September 12, 2017, after thanking the Jacobi Manager for a referral, Weinberg texted: "UR really taking care of me.  I'm coming tomorrow with some pizza.  Nothing crazy just want to come by and I never come empty handed lol[.]"  In addition, on November 1, 2018, Weinberg texted the Jacobi Manager: "Let's set up a dinner with us and ur crew[.]  You've been so good to us I want to thank everyone."

79.     Morris Park also offered the Jacobi Manager tickets to Yankees games, invited her and her two staff members to a Morris Park-sponsored holiday party, and frequently arranged for food to be delivered to her office.

80.     From 2017 to 2019, Weinberg regularly reached out to the Jacobi Manager to ask for patient referrals so he could fill empty beds. For example:

- On August 3, 2017, Weinberg texted the Jacobi Manager asking if there were "any good referrals today." She responded: "Let me see what I can do[.]"

- On August 5, 2019, Weinberg texted the Jacobi Manager that the facility had "15 empty beds if u have anyone to send." She responded: "I'll send you all I have."

81.     Weinberg, as Morris Park's Administrator and Compliance Officer, was well aware that it was unlawful to knowingly offer anything of value, including cash, for the purpose of inducing the referral of Medicare patients to Morris Park.

82.     Morris Park, including Weinberg, knowingly paid remuneration to the Jacobi Manager to induce patient referrals, in violation of the AKS and the FCA. Morris Park submitted, and Weinberg caused to be submitted, claims seeking Medicare reimbursement for skilled nursing care provided to residents who were referred to Morris Park by the Jacobi Manager and the staff who reported to her. Many of these Medicare claims were false because they resulted from violations of the AKS. In addition, by offering and paying remuneration to induce patient referrals, Morris Park rendered false the prior certifications it had made in its Medicare enrollment application to comply with the AKS.

## CLAIMS FOR RELIEF

### FIRST CLAIM

#### Violation of the False Claims Act:  Presenting False Claims for Payment
#### (31 U.S.C. § 3729(a)(1)(A))

83.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

84.     The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act.

85.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims for payment to Medicare.

86.     By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

### SECOND CLAIM

#### Violation of the False Claims Act:  Use of False Statements
#### (31 U.S.C. § 3729(a)(1)(B))

87.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

88.     The United States seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

89.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, or caused to be made and used, false records and statements that were material to false or fraudulent claims for payment submitted to Medicare.

90.     By reason of these false records or statements, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

### THIRD CLAIM

**Unjust Enrichment**

91.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

92.     Through the acts set forth above, Defendants have received payments to which they were not entitled and therefore were unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands judgment against Defendants as follows:

A.   On Counts One and Two (FCA violations), a sum equal to treble the United

     States' damages and civil penalties to the maximum amount allowed by law; and

B.   On Count Three (unjust enrichment), a sum equal to the damages to the extent

     allowed by law; and

C.   Such further relief as is proper.


Dated: May 5, 2023
      New York, New York

                DAMIAN WILLIAMS
                United States Attorney for the
                Southern District of New York

By:    *Jeffrey Powell*
                JEFFREY K. POWELL
                Assistant United States Attorney
                86 Chambers Street, Third Floor
                New York, New York 10007
                Telephone:  (212) 637-2706
                Email: jeffrey.powell@usdoj.gov
                *Attorney for the United States of America*